May it please the Court, Catherine Tassinari for the Plaintiff Appellant, Christine Williamson. And I am hoping to reserve some time for rebuttal. Okay. In this case, we don't have an acceptable medical source who is a treating source during the adjudicatory period, but we do have a person who has worked as a case manager and also has given some treatment to the plaintiff for over a three-year period, and she's had over 100 contacts with a plaintiff appellant. She gave a written opinion. She also testified at the hearing. And I'd like to ‑‑ there's two aspects to her evidence. First, we have her ‑‑ there are voluminous records from Douglas County Mental Health where Diane Brending, the case manager, works. And we also have her testimony and letter where she gave her opinions. And I'd submit that all of these fit together to show that the plaintiff does not have the mental capacity to respond appropriately to supervision and to be appropriate in the workplace. Now, this is Brending's opinion, but I'd also submit that it's supported by her records, that there are numerous periods of in her records where she's not really talking too much about what's the mental state of the claimant, but she repeatedly notes over a long period of time that plaintiff has irritability. She describes her as responding in her usual brusque fashion. All the way into June of 2007, she said, today she displayed no irritability, a rare occurrence. Counsel, Judge Gould, if I could ask one question. I'm not understanding why irritability alone would disqualify somebody from working. At least I know I've been in some context as a lawyer or a judge where some lawyer I was working with or some judge I was working with was irritated about something that was done or said, and it didn't mean they couldn't work. Well, I think it works better in some fields than others, Your Honor. But I think that where my client will be working, she's in an unskilled work situation. And what the vocational expert testified to, that somebody who doesn't respond appropriately to supervision simply will not be retained for any length of time. And I did focus on irritability, but she, it's more than just that. She describes my client as negative, always looking on the negative, surly. She's actually a very street-hardened person. She's lived in a, she's had a very hard life. And she doesn't respond appropriately. I think the example that Brendan gave is that she went to take my client to go get some prescriptions filled, and there was a delay, and Ms. Williamson just behaved very inappropriately, became loud and aggressive. And there's a thread of this throughout the whole record. I think, although Dr. Eckstein's opinion, which was given prior, about six months prior to the adjudicatory period, although it's somewhat limited, she didn't have any of the mental health records, and she only saw the claimant on one occasion. But she notes that the plaintiff, in the Weschler testing, it showed that she would have difficulty understanding the subtle nuances of social interaction and would be sensitive to criticism. And although she couched these as a possibility, she said that she may have these problems, is very consistent with what Brendan's comments show and also what her opinion was at the hearing. She had, Ms. Williamson had a job at one point or did as a, in a logging site. Can you explain what that involved? She was working as a flagger in a logging site. What and where was that? Is it like out in the woods? I believe it was out in the woods. And the way I understood it, if I'm understanding it correct, remembering the correct job, I think she had a, she was getting enough money. What was the nature of the job, given what you've said? She was out flagging logging cars? I think she was, the way I understand it is that I think she was standing on the highway being a flagger for when cars were coming. Working with a, Ms. Tessa, she was working with her uncle, I believe it was, in the record. Okay. As a flagger. I think there was some discussion by Brendan as to whether she was being taken advantage of in that setting, although that may have been the fishing job. But it was a very short-lived position. Before you run out. No, go ahead. Go ahead. No, I was just going to say, was there any evidence whether any of these traits that you're emphasizing played out in that actual work experience? I don't think anybody went on the work site with her, so I didn't see anything like that. Okay. Judge Pines? Yes, Ms. Tassanari? Yes. Let me see if I can, is it your understanding that the ALJ completely discredited, gave no weight to Brendan's opinion? No, he gave several reasons. Well, that's not my question. Yeah. Did he give some weight to Brendan's opinion? He said he gave limited weight. Can you discern what part of her opinion he may have relied upon? He found that she should not work with people and she should not work with coworkers or with the public. And I agree that he did give weight to that in his residual functional capacity assessment. And my issue would be that he did not address how she would deal with supervision. And also, he didn't give as much weight to her. I mean, she said she saw marked social functioning limitations and marked limitations in concentration, and he did not credit that. How about her ability to keep pace, to work in a timely manner? Well, he found that she could sustain simple routine tasks, so he did not credit Brendan on that point. One last question. I know your time is getting short, but with respect to Dr. Eckstein, the one problem that I have is the fact that ALJ pointed out that in her answers, in taking the test, the Welschler test, Dr. Eckstein noted that she may have been exaggerating certain responses, and therefore, Dr. Eckstein only gave – she noted that her opinions were somewhat tentative, although she did note that she didn't think the answers were completely useless because she said they could be interpreted and given some weight. Is that right? Yes. I mean, obviously, the suggestion that there may have been some exaggeration of her problems is the weakness in the case. But also, Judge Eckstein was aware of that, and she said it didn't render the test uninterpretable. And so to me, the significance is when you go through all the aspects of that personality inventory, it is highly consistent with the record, which I think I pointed out in my briefing. Why wasn't Dr. Eckstein's hesitation or noting her tentative concerns, why wasn't that a substantial reason to give less weight to Eckstein's opinions? Well, Your Honor, oddly enough, the ALJ didn't give less weight. He said he was giving significant weight to her. He just interpreted her findings himself, I would say. Okay. So he didn't say he was rejecting Dr. Eckstein or giving her less weight. He said he was giving her significant weight. And so I'd argue that if he was giving significant weight – But only to the extent her opinion was consistent with his determination regarding her residual functional capacity. Isn't that correct? That's true. Okay. I think you answered the question. Why don't – I'll give you a minute for a rebuttal. Okay. Thank you. We took up some of your time. Good morning, Your Honor. Good morning, Judge Gould, Judge Fischer. David Burdette, representing the Commission on Social Security. And Judge Pius. I'm Fischer. He's Pius. Yes, Judge Pius. Judge Gould, Judge Fischer. Yes. Good morning. I'll look at the screen for you, Judge Pius and Judge Gould, and I'll talk to you live, Judge Fischer. Right. I think with regard to this case, there's no error of law that's been identified. It's all about the interpretation of the facts. And as Judge Pius, I think, was getting at with his questions, it collapses into whether you believe that the ALJ was reasonable in his interpretations of Dr. Eckstein's opinion and Ms. Branding's report. And I would respectfully submit that he was. The exact language that Dr. Eckstein uses is on 573, and it is true, as Ms. Tassinari has said, that the test, she said, was interpretable, in spite of the exaggeration of symptoms. But here is the quote. Although this pattern does not indicate a level of distortion that would render the test results uninterpretable, the following hypotheses should be taken as tentative, as they may overrepresent the degree or extent of pathology in certain areas. And that, I think, is the reason why the judge can say that he gave significant weight to the opinion, because he is looking at a doctor who describes her own opinion and conclusions as hypotheses that may overrepresent the extent of the claimant's limitations. With respect to the opinion of Ms. Branding, of course, she's a lay witness. And it is true that she did see and have contact with the claimant many times over a period of a few years there. But a lay witness can be rejected for a germane reason. And he did, as I think Judge Pius was also getting at, he did give some weight to Ms. Branding's opinion in the RFC. He limited her to not working with the general public and was limited from jobs where there are, let me see if I can work here, was limited from jobs where there is ongoing cooperative teamwork. Okay. The VE found the jobs of seedling sorter and optical goods cleaner where those conditions were met, and the ALJ relied on that testimony. And I would even go so far as to say that in her past relevant work as a motel housekeeper, that she could return to that work, as the ALJ found, because those conditions don't apply there as well. May I ask you a question about Branding's letter of February 29th? In her final paragraph, she says, referring to her, referring to Williamson, her understanding and memory are materially limited, as is her ability to sustain concentration and persistence. Williamson's record with her ability to work persistently at a particular task seems to be impaired, and that notion seems to be throughout the various statements and the testimony. And even the ALJ makes note of it, but he doesn't include that in his residual functional capacity assessment, which I don't quite understand why not. Well, he doesn't say that in the residual functional capacity assessment. You're right, Your Honor. But he does say elsewhere in the opinion that, in evaluating her for the listings, that her concentration, persistence, and pace are moderately limited. So mild, moderate, marked. He says moderate. Ms. Branding says marked. Ms. Branding, of course, is not a doctor. So he does take account of that limitation. But did he take account? When he framed the RFC, did he take account of that? I think he did. In his opinion to the vocational expert? Yes, I think he did. I think he did in the colloquy with the vocational expert. Well, I didn't see it. It's pretty long, but I think he did. I have one other question. One of the reasons why the ALJ discredited Ms. Williamson's testimony was because of her living arrangements, that she lived by herself, and the ALJ noted that she must be able to take care of herself, which is inconsistent with her testimony regarding her limitations. But as I read the record, she had Section 8 housing. The ALJ seems to make it look like she lives in a house with a yard and whatnot, but I didn't get that impression from reading the record, and that she obtains significant assistance from Branding's organization and from Branding herself in many of her daily needs. Yes, candidly, Your Honor. And the ALJ just passes over that, and I don't really see how his conclusion that she's capable of her living arrangements and how she conducts her daily affairs suggests that her capability of working is more than she's stating when there's no attempt to pinpoint her living functions and how they might transfer to a working environment. I agree. I agree, Your Honor. That is not a very great reason to find somebody capable of robust activities of daily living when they're living in Section 8 housing and getting all these social services. But I would respectfully submit that there are other valid reasons. The ALJ noted that she was hired out at some point as a babysitter. She was babysitting a three-year-old for several hours a day, and as the parent of a three-year-old, I can tell you that that is not a mean feat if you're paying attention to the level you should be. She said, as the ALJ noted, that she was laid off from the motel housekeeper job, not due to her inability to perform, but because there was a lack of work. They didn't need that many people, and she said, they liked my work. The evidence of symptom exaggeration that we've already discussed in the context of Dr. Eckstein's opinion is itself a valid reason to discredit her credibility. So I think that there's evidence that she goes fishing, that she was working at this job as a flagger out in the woods, and there's evidence that Judge Fischer addressed. So I think that the ALJ did point to valid reasons to discount her credibility, Your Honor. Our case law says that we don't expect people in Ms. Williamson's position, you know, they have a life to live, and just because they're able to do some activity at the home doesn't mean that they're not disabled. I agree. And also our case law says that people who attempt to work, that is not a disqualifying circumstance. No, it's not a disqualifying circumstance to attempt to work, Your Honor. And with respect to her attempt to work at the motel, Brending testifies that she assisted. Her organization helped. Williamson was participating in a work program and working at the hotel was one of the jobs. And although the hotel didn't have work, Brending testified that one of the problems was that Williamson couldn't keep up with the work. Well, with respect, Your Honor, Ms. Williamson didn't say that. And I would also, in the last few seconds that I have here, point to the fact that the evidence of symptom exaggeration is also a valid reason for the ALJ to discredit her testimony under the case law. Okay. So I think that in sum, we're looking at a case where it's about two different interpretations of the facts. And I submit to you respectfully that the Commissioner's interpretation is reasonable and should be affirmed. Okay. Thank you. Any questions from my colleagues? No questions. Thank you. Just to clarify, the ALJ did not ask the V.E. to consider moderate limitations and concentration. He asked whether he asked he included in the hypothetical that she could not do detailed or complex work. Plaintiff's counsel asked about marked limitations in the ability to attend and concentrate, and the V.E. obviously said that would preclude work. That's at page 59 of the transcript. And then the V.E. was asked about appropriate supervision and what would that look like, and the V.E. talks about that at page 61 of the transcript and is really describing what it means to be appropriate. It means being able to respond to questions from the supervisor, listen, ask questions, and take some constructive action. And plaintiff would submit that she's not capable of doing that. Thank you. Thank you. Thank you, counsel. We appreciate the argument. The case is submitted. Next case on calendar then is Boyer v. Belli.
judges: Fisher, Gould, Paez